Our first case up this morning is 424-1576 and 1577 in Ray, G.P. et al. Uh, I'd ask your appellant's counsel, please state your name. Uh, Lorena Trujillo on behalf of the appellant, Brett Pine in this matter. That's Trujillo, is that pronounced correctly? Uh, yes, your honor. Okay. And the counsel for the appellate, please state your name. I'm David Manson with the appellate prosecutor's office on behalf of the state. Thank you, counsel.  Trujillo, on this time on behalf of the appellant, you may proceed. Thank you, your honor. Uh, may it please the court, counsel. Um, my name is Lorena Trujillo and I represent the appellant, Brett Pine in this matter. Uh, Mr. Pine respectfully requests that this court reverse the decision of the trial court or remand the case to address the issues raised in our brief and discussed here today, there are two issues in this case. Um, the first is regarding the trial court's decision that, uh, Mr. Pine was found as an unfit person. And the second was, is that, um, the trial court's decision that it was in the minor children's best interest to terminate Mr. Pine's parental rights. Um, first regarding the issue of unfitness, um, the trial court's decision to find Mr. Pine an unfit person was against the manifest way of the evidence. Um, it was established that, uh, Mr. Pine did maintain a reasonable degree of interest concern or responsibility as to the children's welfare. Um, the testimony showed that appellant did make reasonable efforts and reasonable progress, um, to, towards the return of the children within the nine month, uh, periods of time. The relevant nine month timeframes are the following, um, July of 2022 through April of 2023, uh, April of 2023 through July of 2024 and November of 2023 through August of 2024. You're going to have to enlighten us on what progress he made. Uh, yes, your honor. Um, that is, uh, my next point, um, regarding, um, his progress that he did make, um, Mr. Pine, sorry. Um, regarding the progress that is made, um, this is, uh, um, this is measured by the court, um, review of, um, sorry. Actually, let me rephrase. Um, the progress is measured by his, um, efforts and progress towards, uh, fulfilling his service plan. Um, and, uh, it, it requires at a minimum, um, measure measurable or demonstrable movement towards the goal of returning the child home, which, um, is required from the, uh, fulfilling the goals in the service plan. And so just relax for a minute, but we understand what that is. I want to know what progress he made. And I want to know that in the face of the fact that he still uses methadone. No reduction in that. He regularly falls off the wagon and relapses. He's made no progress at all in almost three years or two years and a half. Um, well, regarding that, your honor, um, uh, Mr. Pine did complete the majority of the goals in his service plan, barring the one that is substance abuse treatment. Um, however, he did, um, take, um, take steps to, uh, move towards attempting to complete that goal, um, by being in the methadone program that is, um, in order to hopefully, um, um, achieve sobriety. Um, so even though he was, he has been in that program for a while, I mean, it is with the goal of hopefully attempting sobriety in addition to, uh, being compliant with the methadone treatment program, he also attended, uh, meetings and sought, um, counseling and group counseling, um, to, uh, try to achieve that goal, um, and another question for you about your brief, you, uh, in the background section of your brief, in large measure, it consists of, uh, statements pertaining to evidence and discussion presented at permanency review hearings before the petition to terminate parental rights was filed. And the fitness portion of that, uh, hearing on the petition to terminate parole rights was held. This court, uh, has repeatedly said, and as recently as, um, two years ago, that the trial court's fitness findings made after conducting a hearing on a petition to terminate parental rights are to be based solely on the evidence the court heard at the fitness hearing, not on any evidence that may have been presented at other hearings that preceded the fitness hearing, such as permanency review hearings. Why should we, uh, pay any attention to your brief that discusses permanency review hearings? Um, your honor, um, though the background section does involve, um, a discussion of the permanency review hearings, uh, many of those were, um, referenced or indirectly discussed, um, throughout the testimony and the two different, um, hearings that took place regarding the unfitness of both parents and the best interest of the child. And so you refer to the testimony presented at the fitness portion of the termination proceedings, whatever that testimony it is, but you talk about evidence and arguments made at permanency review hearings standing alone, that's not appropriate, is it? Um, no, your honor, I would agree. It's not appropriate. Um, one other thing about this case, is my understanding correct that, uh, these children have, uh, been in foster care for almost a thousand days? Uh, yes, your honor. That is correct. My understanding is correct. Well, the reason I, I mentioned that is over 30 years ago, this court defined reasonable progress, which is one of the bases that the trial court found your client, uh, uh, to be, uh, a, uh, unfit parent. This is what we said. Reasonable progress is an objective review of the steps the parent has taken toward the goal of reunification and examines the demonstrability and quality of those steps. Reasonable progress exists when the trial court can in the near future, it will be able to order the children returned to parental custody. What about this record following up? And just this connects question provides any basis for the trial court of this court to conclude that in the near future, after 1,000 days in foster care, these children could be returned to the custody of their parents. Um, well, your honor, um, regarding, uh, Mr. Pine and his progress and efforts, um, uh, he, he did, um, relapse. Um, and that was in, uh, September of 2023. And then again, um, at the end of January, uh, slash the beginning of February in 2024. However, prior to that, um, he, it was, uh, he did make, um, efforts and it was, that was shown through the, the negative, um, drug drops and the random drug drops that he was, um, complying with, um, the substance abuse treatment, and he was testing negative for illicit substances, other than methadone. Um, regarding those two relapses, um, that he did have, um, prior to that, though, he was making, um, significant, um, progress because he had completed the rest of the goals. Um, and though some of the issues that the judge referenced in the trial court, um, was that one of the main issues was his, um, continued resident, um, continued residency with, um, Ms. Freeman, um, and it was mentioned, uh, in the testimony that if he was not living with her, um, that he would have, it, it might've been a different, um, outcome regarding the case, but since he was still in a relationship and living with her, um, it, it was deemed, um, his, his progress was deemed unsatisfactory. But, um, barring that, it did show that he was maintaining, um, like a reasonable degree of interest and concern and responsibility by making strides to complete the service plan, uh, attempting to stay sober. And, um, um, these, uh, I think that these would go towards, um, showing that with a little bit more time, it is possible that, um, perhaps the children would be returned home sooner, if that answers your question, your honor. Okay, go ahead. Um, counsel, counsel, if I may, if we could maybe spend a little bit of time on the best interest portion as well, the trial court there, um, found that the children, as has been noted by Justice Steigman, had been in care for almost a thousand days, I believe 976 at the time of the hearing, and pointed out that the respondent was still taking methadone without a reduction and was really unable to maintain sobriety for any significant amount of time, how is the trial court's conclusion with regards to the best interest? How are the, that conclusion, um, I guess what I'll say, how's the opposite conclusion readily apparent, um, such that, that we would have to find that this, um, decision, you know, was against the manifest way. Um, regarding the, the best interest, um, the, the court did, um, um, the court did find, uh, regarding the, the factors for determining best interests of the child, like the court did find that the children were in a stable and secure environment and their needs were met, um, however, um, like we believe that perhaps more weight should have been, um, given to the factors, um, regarding the development of the child's identity, the familial and cultural background, um, ties and the children's sense of attachments, um, to their parents, um, in addition to the children's sibling relationship, um, though the, the children were, are, um, doing well in their foster placements, um, those other factors, um, should have, um, perhaps should have, um, been given more weight, um, when compared to the factors that the trial court was relying on. And, and I appreciate the argument with regards to more weight, but really the standard we have to look at is how is the opposite conclusion readily apparent? So, what do you believe the strongest evidence is of that in the record? Um, regarding Mr. Pine's, um, relationship with his children, um, I think it is apparent that the children's relationship with their parents and their attachment to their parents, um, is they have a very strong bond with them, um, and an opposite conclusion could be reached, um, regarding their, um, an opposite conclusion could be reached, uh, regarding, um, the, sorry, I, I lost my train of thought.  Let's take your time. Um, it, it could be seen that it would be in the best interest for, um, the children to maintain that relationship, um, with their father, um, due to the fact that, um, he really, uh, the only issue was his, uh, failed, um, maintenance of sobriety, um, like meeting all of the other factors, um, and maintaining a strong relationship, um, and, um, I think that, uh, uh, an opposite conclusion could have been reached due to that. Um, uh, regarding the, the, um, fitness of Mr. Pine, um, um, the review of his reasonable efforts made, um, I'd like to, um, emphasize that that is viewed in, um, regarding his particular circumstances, um, and so taking that into account, um, his, uh, his efforts were evident despite the fact that he was, um, still an addict and, um, was living with Ms. Freeman. Um, however, uh, in spite of his, um, lack of completion for the substance abuse treatment, um, Mr. Pine did demonstrate that, um, he cared and was, um, dedicated to, um, in order to complete that last final goal. Um, and should the court determine that, um, the decision that Mr. Pine was an unfit person, um, was not, um, was not against the manifest weight of the evidence, um, we would ask that the court consider, um, finding it against the manifest weight of the evidence that it was not in the children's best interest to terminate the parental rights. Um, there is case law, um, that we, um, that was mentioned in my brief regarding the fact that a parent can be found unfit, um, but that does not automatically mean that the parent is not fit to be the child's, um, legal father, um, with the specific rights and privileges that that, that accompany that. Um, I'm finished. Okay. Anything further council? Oh, no, I'm sorry. Your honor. No, nothing further. Okay. Thank you, Mr. Manchin behalf of happily you make, you may make your argument at this time, sir. Thank you, your honor court council. In this case, the trial court found respondent father to be unfit on six different grounds, lack of responsibility, lack of progress in three times and lack of effort in two separate times. Uh, the, while the unfitness has to be proved to be, uh, by clear and convincing evidence, once the court reaches that decision, the review standard review is clear and convincing is the opposite, uh, conclusion clearly evident from the evidence. Mr. Manchin, I have a question. It's really not so much on the, uh, the circumstances of this case, but just the question generally about why do prosecutors do what they do? And the example is we have, uh, as you just said, what was it? Six different counts alleging parental unfitness here under the adoption act. And surely, uh, you would think prosecutors have noticed, and I'm sure SAP has noticed that, uh, two things, one, any one ground is sufficient for this court to affirm a finding of, uh, in fitness and termination of parental rights. And two, unless I missed it, uh, when there are multiple grounds for unfitness, this court has, uh, not just routinely, but I think pretty much in every instance focused on reasonable progress, which is an objective standard. And if they find that we find that shown, we affirm, or we don't bother discussing anything else. Um, yet there's a lot of evidence and testimony presented perhaps at the trial level, uh, having arguably not much of anything to do with the question of was reasonable progress, uh, made in this case. And, uh, is this ever discussed with, uh, local prosecutors of why are you doing this? And, you know, you're looking at a panel of, uh, we formerly all had honest work by that. I mean, we're all trial judges before getting in this wonderful job. And, uh, you know, if I were back as a trial judge and they could, I got better things to do than to hear maybe hours worth of testimony on an issue that's no one's going to be concerned with, not, not, uh, me on the trial court or the common enemy, otherwise known as the appellate court. So how many thoughts about all this? Your Honor, I am not aware of any discussions with state attorneys about what they charge and why they charge it or why the prosecutors do. I think it's, my opinion is, is the typical lawyer thing that you throw as much as you can at the wall and hope some of it sticks. Uh, that, uh, it was like with the criminal where they overcharge, uh, six different counts and hoping they'll admit to one. Well, I remember that, uh, I see prosecutors charging multiple counts of murder and then the last one is battery. And I'm thinking, what's that all about? But I digress. I apologize for, uh, interfering with your, uh, argument, but I know, uh, this isn't your first rodeo. And I figured you might have some thoughts on that. Well, I agree that it would be handier if they would just pick one and just do it, going to be short and sweet because like just simply the, uh, lack of effort in, uh, November 23 to August 22, uh, there, the evidence was that he tested positive for drugs in January and February, and then dropped out of sight, no contact at all. That is not effort, period. Call that evidence? Yeah. Uh, the, uh, as, uh, another one's pretty cut and dry is the, uh, lack of progress, April 22 to July, 2023. There, there's no services completed, missed drug tests, testing positive for cocaine, uh, no counseling, uh, as of July, 2023, the goal of return home was simply not closer. So just on those two bases alone, this court should affirm the, uh, trial court's finding on fitness. Uh, I think that as far as reasonable progress, counsel keeps stressing that defendant responded, did everything except the drugs. Well, that was the problem. The children were brought into custody because of drugs. And when you don't take care of that problem in any particular, uh, either, uh, timeframe, there's simply no progress in that timeframe. Uh, she points to the fact that he tries, but what does he try? He, uh, is assigned to a program to get him off methadone, but drops out of it. That didn't, doesn't restart it. Uh, he decides to go, uh, this is April 23 to January, 2024. Um, he, uh, decides to go cold Turkey and then relapses and decides says that, uh, taking drugs was better than going to the hospital or seeking, uh, uh, treatment for the, uh, drug problems. Um, so again, there's simply no progress. I note that the respondent admitted that, uh, getting his children back was not enough for him to keep sober. I don't remember that. I believe that was in the, uh, uh, uh, as far as the termination, what's the best interest of the child. So it doesn't really go to progress responsibility or effort, but it is something that the trial court had to consider as to what is the best interest of the children. And as far as the best interest of the children here, you have two children that had been in, uh, care for two and a half years, their foster families, the only family they have ever known. They have a closer bond to the foster family than the, uh, respondent. And you have a respondent that said, after two and a half years, I still need more time. I, and the trial judge said, no, you've had enough time. The, one of the goals, statutory goals of the juvenile court act is permanency at the earliest possible, uh, opportunity. And I think giving this respondent more time after two and a half years is contrary to that purpose and interest. The, uh, trial court considered all the relevant factors. It considered and specifically referred to the, uh, relationship between the two children living in two foster homes that are back to back where they took the fence down between them so that they have easy access to each other. Uh, both foster parents willing to allow future contact between the children. So the concern that as far as the development of the family relationship or the, uh, of the children, the trial court considered it and gave the proper weight to it as, uh, saying that's ground, uh, grounds for saying, yes, termination is in their best interest. And as far as the lack of responsibility, the counsel noted that, uh, respondent was, uh, was still living with the respondent mother. Her record as far as compliance was even worse than his, as far as drug usage, uh, and engaging in programs. And, uh, he was especially told, hey, if you continue to relate, uh, maintain your relations with you, your chances of getting your children back are worse, but he maintained the relationship to the life of the program. That is simply not responsibility as to the children. If there are no further questions, I will stand on my brief. Thank you, Mr. Manchin. Ms. Trujillo, any rebuttal argument, ma'am? Um, your honor, I do not have a rebuttal argument. Okay. Thank you. I thank both counsel for your arguments this morning. The court will take this matter in advisement, issue a written decision in due course.